**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 10, 2014**

# In the Court of Appeals of Georgia

A14A0249. MINOR v. THE STATE.
A14A0250. CLAYTON v. THE STATE.

MCMILLIAN, Judge.

Duvalle Rene Minor and Robert Anthony Clayton were tried together and convicted of the crimes of armed robbery and criminal attempt to commit armed robbery arising out of the same incident. Minor and Clayton appeal following the trial court's denial of their motions for new trial. For the reasons set forth below, we affirm.

Viewed in the light most favorable to the verdict,[1] the evidence shows that on the night of December 19, 2011, Jose Hernandez ("J. H.") and Bardomiano Hernandez ("B. H.") (collectively "the victims"), were walking along a pathway off

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Franklin Road in Cobb County on their way home from the store when they were suddenly attacked by two men. The men were wearing black, or dark, clothes with long sleeves. Both men had hoodies or caps over their heads, and the shorter of the two men had a gun. As B. H. began to struggle with the shorter man, the man's hoodie fell, and the victims were able to see him and could identify his face and hair. The shorter man was trying to go through B. H.'s pockets, and when B. H. resisted, the man hit him in the face with the gun, causing him to fall to the ground. Meanwhile, the other, taller man stuck his hand in J. H.'s jacket pocket and grabbed his cell phone. J. H. started backing away, out of the darkness, because he could not tell if the taller man also had a weapon. J. H. saw a patrol car nearby and started shouting.

Meanwhile, Office Jeremy Slatton of the Marietta Police Department, who was patrolling the area, saw a "scuffle" between two men on the side of Franklin Road. As he looked further, he saw another man standing over someone lying on the ground. At this point, the two perpetrators ran off, jumping a fence and running into a nearby apartment complex. Slatton turned his car around and reported the incident on his radio. When he came back, he saw two men on the side of the road pointing toward an apartment complex. Slatton looked in the direction the men were pointing

and saw a man wearing black clothing jumping the fence into the apartment complex and another man was ahead of him, running through the complex.

The officer directed J. H. and B. H. to stay where they were, while he gave chase to the two men in his car. Slatton drove to the apartment complex to which the men had fled, exited his car, and ran after them. He saw them jumping another fence, but they were too far ahead, so he radioed their direction of travel to other officers who had arrived on the scene. Officer Steven Miller of the Marietta Police Department responded to Slatton's report of a robbery in progress, and when he arrived at the apartment complex, he saw two men with dark clothing jumping the fence from inside the apartment's pool area to a parking lot. Miller said the two matched Slatton's description and were running in the direction he had indicated. Miller detained the two men at gunpoint, and each one was placed in the back of a patrol car.

In the meantime, Slatton had returned to the crime scene to interview the victims. When he was notified that two suspects had been detained, he placed the victims in his patrol car and drove them to the apartment complex where the men were being held. The victims were asked, individually, if they could identify two men, who were each sitting in the back of a patrol car. Both victims were able to identify

the shorter man because they had seen his face, but they were unable to identify the other man because his face had been covered during the robbery. At trial, Slatton identified the shorter man, who was identified by the victims, as Clayton and the other man as Minor.

Police later searched the area of the robbery, and although they never located a gun, Slatton was able to recover J. H.'s cell phone. He also discovered "a black, knit-like skull cap"on the ground just on the other side of the fence near the area where the suspects had jumped it. The cap had a slit cut in it, which would allow the wearer to see through the cap if it was pulled down over his face. Although hair samples taken from the inside of the cap did not match samples provided by Minor, the GBI scientist who tested the samples said that the hat also contained a number of hair fragments that were too short or otherwise not suitable for testing. He clarified that he could not definitively say that the hat had not been on Minor's head, only that, of the testable samples, he did not find any that matched Minor's hair.

*Case No. A14A0249*

1. Minor first asserts that the evidence was insufficient to support a finding of his guilt. He notes that the victims never identified him as one of the men who accosted them and the hairs in the skull cap did not match his.

4

On appeal from a criminal conviction, the evidence is viewed in a light most favorable to the verdict. We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under the standard of *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LEd2d 560) (1979). This same standard applies to our review of the trial court's denial of [a] motion for new trial. The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt

(Citation and punctuation omitted.) *Favors v. State*, __ Ga. App. __ (1) (756 SE2d 612) (2014). "As long as there is some evidence, even though contradicted, to support each necessary element of the state's case, this Court will uphold the jury's verdict." (Citation omitted.) *Heard v. State*, 299 Ga. App. 44, 44 (1) (681 SE2d 701) (2009).

Furthermore, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a). Although mere presence at the scene of the commission of a crime is not sufficient evidence to convict one of being a party thereto, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. If the defendant had knowledge of the intended crime and shared in the criminal intent of the principal actor, he is an aider and abettor. Hence, if the defendant was at the scene and did not disapprove or oppose the commission of the offense, a trier of fact may consider such conduct in connection with prior knowledge and would be authorized to conclude the defendant

5

assented to the commission of the offense, that he lent his approval to it, thereby aiding and abetting the commission of the crime. (Citation omitted.) *Kinsey v. State*, __ Ga. App. __ (2) (757 SE2d 217) (2014).

Here, although neither victim could identify Minor as a perpetrator of the crimes, "[c]ircumstantial evidence of identity may be sufficient to enable a rational trier of fact to find a defendant guilty beyond a reasonable doubt." (Citations and punctuation omitted.) *Sellers v. State*, 325 Ga. App. 837, 842 (1) (a) (755 SE2d 232) (2014). Further, circumstantial evidence of a defendant's identity "need not exclude every *conceivable* inference or hypothesis – only those that are reasonable. To set aside the conviction it is not sufficient that the circumstantial evidence show that the act might by bare possibility have been done by somebody else." (Citations and punctuation omitted; emphasis in original.) *Jordan v. State*, 320 Ga. App. 265, 269 (1) (739 SE2d 743) (2013).

The victims testified that they were attacked by two men wearing black or dark clothes. Slatton also observed two men in dark clothes scuffling with the victims. A few moments later, he saw one of the men climbing over a fence and the other in front running through an apartment complex. Slatton drove straight to that complex and saw the men climbing another fence and running away. He radioed the direction of

6

their flight to other officers, and Miller arrived within minutes of the crime to see two men wearing dark clothes climbing over a fence and fleeing together in the direction Slatton described. He arrested the two men, later identified as Clayton and Minor. Both victims positively identified Clayton as the man who scuffled with and tried to rob B. H.. Although they could not identify Minor as the man who robbed J. H., the other perpetrator had worn a mask over his face, and police discovered a mask beside a fence that the two perpetrators had climbed. And even though the GBI was unable to match any hairs in the hat to Minor, other hair samples in the hat were not suitable for testing and the GBI scientist could not definitively eliminate the possibility that Minor had worn the hat. Under these circumstances, we find this evidence sufficient to support Minor's convictions beyond a reasonable doubt.

2. Minor also argues that his trial counsel was ineffective in failing to object to a misstatement of law in trial court's charge to the jury.

(a) To prevail on his claim of ineffective assistance under the two-pronged test set forth in *Strickland v. Washington,* 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984), "[Minor] must show that [his] counsel's performance was deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different."

(Citations and punctuation omitted.) *Anthony v. State*, 317 Ga. App. 807, 813 (4) (732 SE2d 845) (2012). On appeal of a claim of ineffective assistance, "we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, while we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Philpot v. State*, 311 Ga. App. 486, 489 (3) (716 SE2d 551) (2011). Moreover, "[i]f a defendant fails to meet his burden on one prong of the two-prong test, then the other prong need not be reviewed by the Court." *Barge v. State*, 294 Ga. 567, 569 (2) (755 SE2d 166) (2014).

Minor argues that his trial counsel's performance was deficient in that he failed to object to the portion of the final jury charge in which the trial court instructed, "The burden of proof rests on the Defendant (sic) to prove every material allegation in the indictment and every essential element of the crime charged beyond a reasonable doubt." Minor asserts that this omission cannot be considered a matter of trial strategy, because his trial attorney testified at the hearing on his motion for new trial that he did not remember that charge being given and that had he noticed it, he would have brought it to the trial court's attention.[2] The quoted charge is undoubtedly

---

[2] Clayton's trial attorney testified that he did not recall hearing the trial judge giving this charge to the jury. The prosecutor also advised the trial court at the motion for new trial hearing that he did not recall the charge being given in this manner.

a misstatement of law, as denoted by the insertion of "(sic)" in the transcript. But pretermitting whether Minor's trial counsel's performance was deficient in failing to object to the charge, we find that Minor has failed to prove the requisite prejudice to establish his claim of ineffective assistance of counsel.

It is well settled that "[t]he charge to the jury is to be taken as a whole and not out of context when making determinations as to [its] correctness of same." (Citations and punctuation omitted.) *Mitchell v. State*, 242 Ga. App. 694, 697 (5) (531 SE2d 143) (2000). Here, the trial judge instructed the jury in her pre-evidentiary charge that the defendants were presumed innocent, that each element of the crime must be proved beyond a reasonable doubt, and that "[t]he burden of proof rests on the State to prove each essential element of the offense charged beyond a reasonable doubt." In the same charge, the judge repeated that "[t]he burden is always on the State to prove each essential element of the offense charged beyond a reasonable doubt," and that the defendant never has a burden to present any evidence.

Further, in her formal charge at the close of the evidence, the trial judge again charged the jury on the presumption of innocence immediately before the contested charge. And immediately after it, she charged, "There is no burden of proof on the Defendant whatsoever, and the burden never shifts to the Defendants to introduce

9

evidence or to prove innocence." Later in the charge, the trial court instructed that "[i]ntent is an essential element of any crime and must be proved by the State, beyond a reasonable doubt." The trial court also instructed that "[t]he burden of proof rests on the State to prove beyond a reasonable doubt the identity of the Defendants as the person[s] who committed the crime alleged in this bill of indictment" and that "[i]t is not necessary that the Defendants show another person committed the alleged offense." Similarly, the charge noted that the State must prove venue beyond a reasonable doubt "as to each of the crimes charged in the indictment just as any element of the offenses." The trial court also twice identified for the jury "[t]he elements of the [lesser included] offense [of robbery] *that the State must prove* beyond a reasonable doubt." (Emphasis supplied.)

Thus, a review of the charge as a whole clearly demonstrates that on a number of occasions, both before and after the misstatement, the trial court correctly instructed the jury that the State bore the burden of proof beyond a reasonable doubt as to the charges in this case. And the misstatement was so fleeting that neither the trial court, the prosecutor, nor the two defense attorneys noticed it. Therefore,

> at no time was the jury misinformed as to the substance of the actual
> burden. While a correct instruction will not necessarily cure an

10

erroneous one on the same point, we find under the circumstances of this case that the court's substitution of ["Defendant"] for "the State" amounted to a "palpable 'slip of the tongue' and clearly could not have misled or confused the jury."

(Citations omitted.) *Mitchell*, 242 Ga. App. at 697 (5) (no ground for reversal where jury charge contained single misstatement that the sole issue for the jury was to consider "whether or not the *court* has proved the defendant guilty beyond a reasonable doubt" following several correct statements of the law) (punctuation omitted; emphasis in original). See also *White v. State*, 233 Ga. App. 276, 277-278 (3) (503 SE2d 891) (1998) (considering charge as a whole, reversal not required based on trial court's "slip of the tongue" in stating "the State is not required to prove the guilt of the accused beyond a reasonable doubt, all doubt or to a mathematical certainty.") (punctuation omitted); *Volcey v. State*, 200 Ga. App. 881, 883 (3) (410 SE2d 36) (1991) (considering charge as a whole, no ground for reversal for trial court's slip of the tongue in charging jury that the defendant "will be presumed to have acted with criminal intent"). We find, therefore, that Minor failed to establish a reasonable probability that the outcome of the trial would have been different if his trial attorney had raised an objection. Therefore, Minor is not entitled to a new trial on this ground.

11

(b) In his reply brief, Minor also argues that the misstated charge constituted plain error requiring reversal. Although this Court generally will not consider arguments raised for the first time in a reply brief, *Vann v. Finley*, 313 Ga. App. 153, 154, n. 2 (721 SE2d 156) (2011), we note that Clayton also raised this issue in his appellate brief. Accordingly, we will consider the charge under a plain error analysis.

Because neither defense attorney objected to the trial court's misstatement, any appellate review of the charge is precluded, "unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties." OCGA § 17-8-58 (b). Under the plain error standard, "[r]eversal is authorized if all four prongs of the standard adopted in [*State v.*] *Kelly*[, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011),] are met: the instruction was erroneous, the error was obvious, the instruction likely affected the outcome of the proceedings, and the error seriously affects the fairness, integrity or public reputation of judicial proceedings." (Citation omitted.) *White v. State*, 291 Ga. 7, 8 (2) (727 SE2d 109) (2012).

We have already determined that the contested charge was erroneous, and the error in the charge is obvious on its face. But for the reasons previously discussed, we found that the trial court's slip of the tongue did not constitute reversible error. "[I]t follows[, therefore,] that there could be no plain error either (since plain error does

12

not exist in the absence of reversible error)." (Citation and punctuation omitted.) *Dolphy v. State*, 288 Ga. 705, 710 (3) (707 SE2d 56) (2011). Accordingly, we find no basis for reversal on this ground. See *Pitchford v. State*, 294 Ga. 230, 239 (5) (751 SE2d 785) (2013) (no plain error where charge was "an inadvertent slip of the tongue on the part of the trial judge and most likely went unnoticed by those present; had it not, both defendants' attorneys would likely have immediately objected"); *Tanksley v. State*, 323 Ga. App. 299, 304 (2) (c), n. 2 (743 SE2d 585) (2013) (trial court's slip of the tongue in jury charge "did not rise to the level of plain error" when charge considered as a whole).

3. Minor next asserts that the trial court improperly invaded the province of the jury by insisting that the jurors consider the defendants' guilt or non-guilt in a particular order. He cites to the portion of the trial court's charge addressing the verdict forms for each defendant and for each count. The trial judge charged that if the jury found all the elements of armed robbery beyond a reasonable doubt, it should check the first blank on the verdict form. But if the jury found the elements of robbery beyond a reasonable doubt, but did not find an offensive weapon, it would be authorized to convict the defendants of robbery and thus to check the second blank on the form. However, if the jury did not believe the defendants were guilty, or if they

13

had reasonable doubt as to guilt, it should check the third blank on the form, indicating an acquittal. The judge gave similar instructions for the verdict form on the charge of attempted armed robbery.

Because Minor has not demonstrated that he objected to this charge in the trial court below, we must consider this argument under the plain error rule. *White*, 291 Ga. at 8 (2). Minor argues that the trial court's charge violated the rule set forth in *Edge v. State*, 261 Ga. 865, 867 (2) (414 SE2d 463) (1992), barring sequential charges in cases where the evidence demonstrated a single assault that could authorize a conviction for either felony murder or voluntary manslaughter. We note, however, that the Georgia Supreme Court has subsequently identified the *Edge* rule regarding sequential charges as dicta, *Morgan v. State*, 290 Ga. 788, 792 (2) (725 SE2d 255) (2012), and limited its application. *Foster v. State*, 264 Ga. 369, 369 (1) (444 SE2d 296) (1994). Moreover, this Court previously has determined that the prohibition against sequential charges has no application in a case such as this one involving a charge of armed robbery and a lesser included offense of robbery. *Davis v. State*, 264 Ga. App. 221, 227 (5) (590 SE2d 192) (2003); *Kirk v. State*, 210 Ga. App. 440, 443-444 (2) (436 SE2d 553) (1993). And this Court also has approved a

sequential charge, where, as here, it incorporated the reasonable doubt standard. *Parks v. State*, 241 Ga. App. 381, 384 (5) (526 SE2d 893) (1999).

Accordingly, the contested charge was not reversible error, much less plain error, *Dolphy v. State*, 288 Ga. at 710 (3), and Minor is not entitled to a new trial on this ground.

4. Minor further contends that during jury selection, the State violated *Batson v. Kentucky*, 476 U.S. 79 (106 SCt 1712, 90 LE2d 69) (1986), by using six of its nine jury strikes to eliminate six black veniremen and by failing to give a race-neutral reason for one of its strikes.

> *Batson* provides a three-step process for adjudicating a claim that a peremptory challenge was based on race: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent. A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous.

(Citation omitted.) *Woodall v. State*, 294 Ga. 624, 627 (3) (754 SE2d 335) (2014). The *Batson* test enforces the criminal defendant's "constitutional right to be tried by

15

a jury whose members are selected pursuant to nondiscriminatory criteria" and the individual juror's "right not to be excluded from a jury on account of race." *Lewis v. State*, 262 Ga. 679, 680 (2) (424 SE2d 626) (1993). "The exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party." (Citation and punctuation omitted.) Id. And the "proffer of a pretextual explanation naturally gives rise to an inference of discriminatory intent." (Citation and punctuation omitted.) *Toomer v. State*, 292 Ga. 49, 55 (2) (b) (734 SE2d 333) (2012).

Although voir dire was not transcribed, the *Batson* hearing reflects that the State used six of its eight strikes for the regular jury on black veniremen, leaving a jury composed of two blacks and nine females. The State exercised a ninth strike in excluding another black venireman from serving as an alternate juror. Defense counsel made a *Batson* challenge on this basis. On appeal, Minor takes issue only with the State's strike of Juror No. 31, a black male. The prosecutor explained this strike by noting that the juror had a conviction for theft by receiving and this case "is a theft-related case." He also noted that the juror had gold teeth, and he did not like gold teeth. The prosecutor stated that he would have had the same reaction to a white

16

juror with gold teeth. The prosecutor emphasized that his strike was primarily based on the juror's prior conviction.

Defense counsel countered, however, that somebody else had been charged with theft, but Juror 31 had been charged only with misdemeanor criminal damage. Defense counsel then started to address the "gold teeth" explanation, but the trial court interrupted and interjected that she "[was] not impressed [with] the [State's] gold teeth argument." Defense counsel replied that he was not impressed with it either and began to reference another case when the trial court again interrupted, stating, "Let's not go there. I said I'm not going to accept the gold teeth argument. Do you want to talk me out of it?" Defense counsel replied, "You say you're not impressed with it. I'm good with that." The trial court then agreed with the prosecution that Juror 31 had been charged with theft and found that the juror's prior theft charge presented a race-neutral basis for the strike. And after noting that the State's last strike was of white female, she denied the *Batson* challenge.

On appeal, Minor argues that he is black and "the prosecutor used six of his nine strikes to remove black jurors" to support his claim that the defendants established a prima facie showing of purposeful discrimination. *Brown v. State*, 291 Ga. 887, 889 (2) (734 SE2d 41) (2012). And he further asserts that the prosecution's

17

reference to gold teeth in striking Juror No. 31 was clearly based on an improper racial stereotype.

Although the trial court did not expressly determine that the defense had established a prima facie case under *Batson*, "the trial court did require the State to articulate its reasons for the peremptory strikes, rendering moot the issue of whether [Minor] had established a prima facie case." *Arrington v. State*, 286 Ga. 335, 339 (9) (687 SE2d 438) (2009). See also *Hernandez v. New York,* 500 U.S. 352, 358 (II) (A) (111 SCt 1859, 114 LE2d 395) (1991); *Lewis*, 262 Ga. at 680 (2). Accordingly, we do not address whether Minor established a prima facie case under *Batson*.

The State cited two reasons for striking Juror No. 31, his prior theft-related charge and his gold teeth. Minor argues that in striking the juror based on his gold teeth, the prosecution was relying upon a racial stereotype, citing this Court's opinion in *Rector v. State*, 213 Ga. App. 450, 452 (2) (444 SE2d 862) (1994). In *Rector*, this Court addressed the strike of a juror based, in part, on her "big gold tooth with a pattern on it right in the front of her mouth." 213 Ga. App. at 452 (2). The trial court expressed concern as to whether this explanation reflected a racial stereotype and refused to accept that reason in and of itself for striking the juror. The court found, however, that other race-neutral reasons supported the strike. Id. at 454 (2). But this

18

Court reversed for a new trial, finding that the other race-neutral reasons given by the prosecutor for striking the juror were insufficient to cure "the element of the stereotypical reasoning employed by the State's attorney in exercising [the] peremptory strike."[3] Id.

In reversing for a new trial, *Rector* relied on this Court's opinion in *Strozier v. Clark*, 206 Ga. App. 85 (5) (424 SE2d 368) (1992), which held that the jury selection process is invalidated under *Batson* when a racially motivated explanation for striking a juror accompanies a racially neutral explanation for removal of that juror. The Georgia Supreme Court has interpreted *Strozier* as standing for the proposition "that where it can be determined that the racially neutral explanation is, in fact, pretextual since there is a racially motivated reason that can be independently determined, the jury selection process is invalid under *Batson*." *Lingo v. State*, 263 Ga. 664, 667 (1) (c), n. 4 (437 SE2d 463) (1993). Nevertheless, the Supreme Court emphasized that "[t]he cases cited by *Strozier* illustrate that there must be some indication that the

---

[3] We note that this Court also found in *Rector* that the trial court could refuse to accept the prosecution's argument regarding the gold teeth because it did not relate "in any way to the outcome of the case." Id. Subsequently, in *Toomer*, 292 Ga. at 54 (2) (b), the Supreme Court of Georgia expressly disapproved prior Georgia cases holding that a reason for a strike must be case-related. However, this holding does not affect *Rector*'s holding that the race-neutral reasons did not cure the prosecution's other stereotypical reasoning.

19

'additional reason' is, *in fact,* racially motivated." (Emphasis in original.) Id. The Supreme Court further noted that in *Strozier,*

> the prosecutor, in addition to stating the apparently neutral reason of the juror's age as his reason for striking her, also gave his completely unsupported opinion that the juror was dishonest in her answer to questions, an opinion he stated was based on an experience the prosecutor had previously, with other jurors, in an unrelated case.

Id. Thus, the Court concluded that "in *Strozier,* as well as the cases cited in its support, it is apparent that the 'additional reasons,' in themselves, were racially motivated and, accordingly, rendered the selection process invalid under *Batson*." Id.

Here, defense counsel never argued that the prosecution's strike based on Juror No. 31's gold teeth arose from a racial stereotype, but each time that counsel began to address the gold teeth explanation, the trial court interrupted him. And although the trial judge stated that she was "not impressed" with the gold teeth explanation and was not going to "accept" it, she made no express finding as to whether the prosecutor's reliance on Juror No. 31's gold teeth to strike him was inherently discriminatory or whether it was race neutral. Although the trial court apparently found the reason to be invalid in some regard, she failed to make the express finding required under *Batson*. As *Rector* demonstrates, a possibility exists that the trial court

20

may have found the gold teeth explanation not to be racially neutral, or the defense may have been able to show that the "additional reason" was merely pretextual. But, the defense had no such opportunity, and the trial court did not make a finding, one way or the other.

Our Supreme Court recently reviewed the *Batson* test and emphasized the importance of the three-step process and the trial court's adherence to that process, noting that the appellate courts

> look to our State's trial judges to ferret out and eliminate invidious discrimination in the jury selection process. But they should do so using the well-defined framework set forth in *Batson, Purkett* [*v. Elem*, 514 U.S. 765, 768 (115 SCt 1769, 131 LE2d 834) (1995)], and the similar decisions of this Court. If trial judges instead were given undefined flexibility to shape and mold the law to fit the particular situation, the result would be unequal and essentially unreviewable legal standards applied in various courtrooms across Georgia. That would not advance our shared goal of ensuring that race and gender have no place in the administration of justice.

(Citations and punctuation omitted.) *Toomer*, 292 Ga. at 55 (2) (b).

Here, the defense was deprived of the opportunity to fully address the prosecution's explanations for the strike and the trial court also failed to decide whether "the opponent of the strike [had] proven the proponent's discriminatory

21

intent" as required under *Batson*. (Citation and punctuation omitted.) Id. at 52 (2) (a). Since the trial court did not allow the defense to explain their argument that the strike was racially discriminatory,

> we remand the case in order to permit the [defense] to do so and to allow the trial court to make findings under *Batson.* Should the trial court determine that the State did not fulfill its burden to provide racially-neutral reasons, a new trial is in order. Should the trial court determine that no *Batson* violation occurred, appellant's convictions . . . will remain in effect. Either party may file a notice of appeal from the trial court's ruling made on remand.

*Lewis*, 262 Ga. at 681 (2).[4]

### Case No. A14A0250

5. Although Clayton does not contest the sufficiency of the evidence presented against him at trial, from our review of the record, we find that the evidence at trial was sufficient to support his convictions beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

---

[4] Although we have remanded the case for further *Batson* proceedings as to Juror No. 31, which could result in a new trial, we have addressed the Appellants' remaining enumerations, even though some of them are not likely to reoccur in any new trial, in order to ensure that they were not entitled to a new trial on other grounds, thus obviating the need for remand on the *Batson* issue.

6. Clayton similarly asserts that the State violated *Batson* during jury selection. Clayton takes issue with the State's strikes of Jurors No. 11 and No. 16, both black females, in addition to the strike of Juror No. 31. Although Clayton is also entitled to a remand on the *Batson* issue with regard to Juror No. 31, for the reasons discussed in Division 4 above, we find no clear error in the trial court's rulings with regard to the other two jurors and that no remand is required for further findings as to those jurors.

As to Juror No. 11, the prosecutor stated that the juror had been held up at gunpoint years ago, and he was concerned that she might want to interject and insert ideas about what she would see or would not see at trial. His concerns arose out of the fact that this was an identification case, presumably referring to the fact that Minor was never identified by the victims. The prosecution also noted that she admitted watching a crime-related television show that often emphasizes fingerprint and DNA evidence, which was lacking in this case, but the trial judge stated that she was not concerned about the "fingerprint issue" with this juror. Rather, the trial court found the prosecution's concerns about the juror's prior experience as a victim of a crime to be a race neutral reason, noting that Juror No. 11 was shaking, was a "nervous wreck," and did not want to reveal her address or her place of work.

23

The prosecutor explained that he struck Juror No. 16 because she was not from Georgia and she had been unemployed for five years, explaining that he has concerns about someone who, although able to work, has been employed for such a long time. The trial judge found this to be a race-neutral reason based on these concerns and noted that the prosecution had also struck a white male who had been unemployed for a long time.

In contrast to the argument regarding Juror No. 31, Clayton does not argue that, the reasons cited for striking Jurors No. 11 and No. 16 were inherently racially discriminatory or based on racial stereotypes, nor has he cited us to any authority holding that similar reasons have been found to be based on racial stereotypes. And without the transcript of the voir dire,[5] we must assume that the trial court's recollection of voir dire, including her recollection of each juror's responses and demeanor, was accurate and supported her decision to find the prosecution's explanations as to Jurors No. 11 and No. 16 to be race neutral. Therefore,

> [w]ithout access to a complete transcript of the voir dire of the jury, we cannot conclude that it was clearly erroneous for the trial court to rule that [Clayton] failed to carry [his] burden of proving that the race-

---

[5] Moreover, Clayton does not assert that anything in the voir dire would help to establish his *Batson* claim with regard to these jurors.

neutral reasons given by the proponent of the strike were merely pretexts for purposeful racial discrimination. The posture of the evidence in the partial transcript does not support [Clayton's] *Batson* challenge. Since the voir dire was not transcribed, we must assume that the trial court did not err in its *Batson* ruling.

*Russell v. Parkford Mgmt. Co., Inc.*, 235 Ga. App. 81, 83 (2) (508 SE2d 454) (1998). Cf. *Cammon v. State*, 269 Ga. 470, 473 (4) (b) (500 SE2d 329) (1998).

Thus, we find that Clayton has failed to overcome the presumption that the trial court's findings were supported by the record and we find no basis for granting a new trial based on the strikes exercised on these two jurors.

6. As previously noted, Clayton also argues on appeal that the trial court committed plain error in charging the jury that the defendants carried the burden of proof as to the charges against them, citing the trial court's misstatement discussed above. But as we found in Division 2 (b) that this charge did not constitute plain error, this enumeration is without merit.

7. Clayton further contends that he received ineffective assistance of counsel because his trial attorney failed to file a motion to suppress the out-of-court identification by the victims and failed to object to "selected" jury charges.

(a) Turning first to Clayton's argument concerning his counsel's failure to object to "selected" jury charges, we note that Clayton fails to identify any such "selected" charges. Accordingly, he has failed to carry his burden on this ground. Even if we assume that Clayton is referring to the trial court's misstatement regarding the burden of proof, we find, for the reasons discussed in Division 2 (a) above, that Clayton's argument is without merit because he has failed to establish the requisite prejudice to support his claim of ineffective assistance of counsel on this ground.

(b) With regard to Clayton's argument concerning his trial counsel's failure to file a motion to suppress, we note that his counsel testified at the hearing on the motion for new trial that he did not file a motion to suppress because after reviewing the evidence and conducting research, he concluded that he did not have a substantive motion. He determined that because the showup was in such close proximity to the time of Clayton's arrest, "all the case law was against us and I just didn't feel that we . . . had a valid motion to suppress identification based on that." Trial counsel also stated that he had several meetings with Clayton about his case, during which they reviewed discovery and watched video tapes. Additionally, the attorney attempted to contact the victims, prepared jury charges, and conducted his "typical investigation."

As a general matter,

the decisions on which witnesses to call, whether to put on evidence so as to preserve the final word in closing argument, how to conduct cross-examinations, what motions to file, and what objections to make are strategic and tactical decisions that, after thorough investigation and client consultation, are virtually unchallengeable and do not require a finding of ineffective assistance of counsel.

(Citation omitted.) *Goodrum v. State*, 293 Ga. App. 856, 858 (3) (668 SE2d 831) (2008).

Moreover, in order "[t]o establish ineffective assistance of counsel on the basis of counsel's failure to file a timely motion to suppress, [Clayton] must make a strong showing that had the motion been considered, the damaging evidence would have been suppressed." (Citation and punctuation omitted.) *Williams v. State*, 316 Ga. App. 383, 384 (729 SE2d 517) (2012). See also *Brown v. State*, 311 Ga. App. 405, 407 (2) (715 SE2d 802) (2011).

Although a one-on-one showup is inherently suggestive, identification testimony produced from the showup is not necessarily inadmissible. We must apply a two-part test to determine whether the showup was impermissibly suggestive, and, if the showup was impermissibly suggestive, we then consider the totality of the circumstances to determine whether a very substantial likelihood existed of irreparable misidentification.

27

(Citations and punctuation omitted.) *Singleton v. State*, 324 Ga. App. 141, 142 (1) (749 SE2d 753) (2013).

As to part one of the test, "[o]n-the-scene showup identifications, like the one here, have been held not to be impermissibly suggestive but necessary due to the practicabilities inherent in such situations." (Citation and punctuation omitted.) *Watson v. State*, 243 Ga. App. 636, 638 (c) (534 SE2d 93) (2000). "Those include the need for a speedy police investigation and the need to resolve promptly any doubts as to identification so as to enhance the accuracy and reliability of the identification, thus expediting the release of innocent subjects." (Citation and punctuation omitted.) *Butler v. State*, 276 Ga. App. 161, 164 (1) (623 SE2d 132) (2005). "As long as the showup was reasonably and fairly conducted at or near the time of the offense, we do not reach the second part of the test." *Young v. State*, 272 Ga. App. 304, 311 (4) (a) (612 SE2d 118) (2005).

As to the second part of the test,

[i]n evaluating the likelihood of misidentification, we look to the totality of the circumstances, including the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

28

(Citation omitted.) *Pullins v. State*, 323 Ga. App. 664, 667 (2) (747 SE2d 856) (2013).

Here, both victims testified that they were able to see Clayton during the robbery because his hoodie fell down. Slatton also observed the crime and was able to provide a description of the perpetrators' clothing and actions and to track their progress as they fled. Miller apprehended Clayton and Minor in the act of fleeing because their appearance and actions matched the information provided by Slatton. Once they were in custody, Slatton immediately took the victims to the showup, only a short time after the crimes had occurred.

Significantly, neither victim identified Minor, but both victims readily identified Clayton as one of the men involved. Slatton testified that when B. H. was shown Minor, "[h]e held his hands up like he wasn't sure . . . and then he looked at me and made a motion with his hands, as if his face was covered. And I asked him, he had his face covered [?] [H]e was wearing a mask [?] [A]nd he indicated that he was." But when B. H. was shown Clayton, he "emphatically started pointing" at Clayton, indicating "yes, that's him, that's him." Slatton testified that J. H.'s response was almost identical. The victims' ability to distinguish between the two men and to

29

identify only the man whose face they were able to see provides additional support to the validity of their identification of Clayton.

Under these circumstances, we find that Clayton has failed to demonstrate either that the showup was impermissibly suggestive,[6] or the existence of a substantial likelihood of irreparable misidentification.[7] "Thus, a motion to suppress the [out-of-court identification] . . . would have been without merit, and the failure to raise a meritless motion or objection is not ineffective assistance of counsel." (Citation omitted.) *Moore v. State*, 293 Ga. 676, 679 (5) (a) (748 SE2d 419) (2013).

*Judgments of conviction affirmed and cases remanded with direction. Phipps, C. J., and Ellington, P. J., concur.*

---

[6] See *Johnson v. State*, 302 Ga. App. 318, 323 (3) (690 SE2d 683) (2010); *Watson*, 243 Ga. App. at 648 (c).

[7] *Singleton*, 324 Ga. App. at 144 (1).