**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J, and BOGGS, J.**

**NOTICE: Motions for reconsideration must be**
**_physically received_ in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 19, 2015**

# In the Court of Appeals of Georgia

A15A0907. THOMAS v. THE STATE.                              DO-036 C

DOYLE, Chief Judge.

Marcus Thomas was convicted of two counts of armed robbery[1] and two counts of possession of a firearm during the commission of a crime.[2] Thomas appeals the subsequent denial of his motion for new trial, challenging the sufficiency of the evidence and arguing that the trial court erred by denying his *Batson*[3] challenges to the State's strikes of four prospective jurors and by admitting his custodial statements into evidence because the statements were obtained after he invoked his right to remain silent. We affirm for the reasons that follow.

---

[1] OCGA § 16-8-41 (a).

[2] OCGA § 16-11-106 (b) (1).

[3] *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986).

On appeal from a criminal conviction, we view the evidence in a light favorable to the verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or resolve issues of witness credibility, but merely determine whether the evidence was sufficient to find the defendant guilty beyond a reasonable doubt.[4]

So viewed, the record shows that at approximately 9:00 a.m. on November 19, 2007, Thomas and an accomplice entered an Augusta gas station, produced a pistol, and demanded the money in the cash register. A customer saw the two men exit the store and run towards a large, blue vehicle in which a woman was waiting.

Later that same day, Thomas and a woman entered an Augusta Subway restaurant. Thomas brandished a black pistol, pointed it at the restaurant employees, demanded money, took paper bills as well as rolled coins from the cash drawer, exited the restaurant, and fled in a light blue van. Thomas had a bandana tied around his face, and the female accomplice wore a white, hockey or "Freddy Kru[e]ger" mask and gloves.

During the ensuing investigation, police discovered that Thomas's wife was a former employee of the Subway. Police went to the home where Thomas and his wife

---

[4] (Footnotes omitted.) *New v. State*, 270 Ga. App. 341 (1) (606 SE2d 865) (2004), citing *Waller v. State*, 267 Ga. App. 608 (600 SE2d 706) (2004).

lived, and found both of them there, as well as multiple other people. A search of the home revealed a hockey mask, a black replica pistol, a Subway ball cap, a bandana, gloves, other clothing consistent with that worn by the assailants during the robberies, and a roll of pennies; these items were found in the bedroom Thomas shared with his wife.

At trial, the gas station clerk identified Thomas as the man who robbed the station Footage of video surveillance of the gas station robbery was played for the jury, as was footage of the Subway robbery. After Thomas was arrested, he initially denied any involvement in the robberies, but after being confronted with evidence, he later admitted that he participated in the robberies and gave details of his actions; a DVD of Thomas's taped statement was played for the jury.

Thomas was convicted and sentenced to two life sentences plus ten years, to be served consecutively. The trial court denied his subsequent motion for new trial, and this appeal followed.

1. Thomas challenges the sufficiency of the evidence in a single paragraph, which lacks any specificity regarding the evidence or the elements of the charges.

Having reviewed the evidence, we conclude that it was sufficient to establish his guilt beyond a reasonable doubt.[5]

2. Thomas contends that the trial court erred by denying his *Batson* challenge, arguing that the State failed to give a race-neutral reason for four of its peremptory strikes during jury selection. This enumeration presents no basis for reversal.

> *Batson* provides a three-step process for adjudicating a claim that a peremptory challenge was based on race: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent. A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous.[6]

---

[5] See *Jones v. State*, 266 Ga. App. 679, 681-682 (1) (598 SE2d 650) (2004). See also *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979); OCGA § 16-8-41 (a) (armed robbery); OCGA § 16-11-106 (b) (1) (possession of a firearm during the commission of a felony).

[6] (Citation omitted.) *Woodall v. State*, 294 Ga. 624, 627 (3) (754 SE2d 335) (2014).

"The exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party. And the proffer of a pretextual explanation naturally gives rise to an inference of discriminatory intent."[7]

Here, although voir dire was not transcribed, during the *Batson* hearing, defense counsel averred that the State used all of its eight strikes for the regular jury and both of its two strikes in the alternate pool to strike black jurors.[8] The trial court found that the defense had met its prima facie showing of racial discrimination and required the State to give race-neutral reasons for its strikes.[9] After hearing the reasons, the trial court found that three of the State's strikes for the regular jury were not race-neutral, and it returned those jurors to the panel; the court found that the

---

[7] (Citation and punctuation omitted.) *Minor v. State*, 328 Ga. App. 128, 135 (4) (761 SE2d 538) (2014), quoting *Toomer v. State*, 292 Ga. 49, 55 (2) (b) (734 SE2d 333) (2012) and *Lewis v. State*, 262 Ga. 679, 680 (2) (424 SE2d 626) (1993).

[8] Defense counsel advised that the jury and the two alternates were comprised of seven white jurors and seven black jurors. The record is not clear on which were the alternates.

[9] "[R]equir[ing] the State to articulate its reasons for the peremptory strikes, render[ed] moot the issue of whether [Thomas] had established a prima facie case. Accordingly, we [need] not address whether [Thomas] established a prima facie case under *Batson*." *Minor*, 328 Ga. App. at 137 (4).

State offered a race-neutral explanation for the State's five other peremptory strikes for the regular jury.[10]

On appeal, Thomas challenges the State's explanations for four of the five strikes that the trial court determined were race-neutral. The State explained that it struck (1) Juror C. W. because she indicated that she had previously served on a jury and could not sit fairly in this case; (2) Juror S. B. because she had previously served on multiple juries, some of which resulted in a not guilty verdict[11]; (3) Juror K. W. because she fell asleep during voir dire and had previously served as the foreperson on a jury that rendered a not guilty verdict; and (4) Juror D. J. because he indicated "that he could not judge a fellow human being."

> [Thomas] does not argue that the reasons cited for striking Jurors [C. W., S. B., K. W., and D. J.] were inherently racially discriminatory or based on racial stereotypes, nor has he cited us to any authority holding that similar reasons have been found to be based on racial stereotypes. And without the transcript of the voir dire, we must assume that the trial court's recollection of voir dire, including [his] recollection

---

[10] The trial court found that the State offered race-neutral reasons for its two strikes for the alternate jurors. Thomas does not challenge these strikes on appeal.

[11] The State also averred that it had independent information – not offered by S. B. – that in one case she was "a hostile juror" and refused to sit with the other jurors.

of each juror's responses and demeanor, was accurate and supported [his] decision to find the prosecution's explanations as to [those j]urors . . . to be race[-] neutral. Therefore, without access to a complete transcript of the voir dire of the jury, we cannot conclude that it was clearly erroneous for the trial court to rule that [Thomas] failed to carry his burden of proving that the race-neutral reasons given by the proponent of the strike[s] were merely pretexts for purposeful racial discrimination. The posture of the evidence in the partial transcript does not support [Thomas's] *Batson* challenge. Since the voir dire was not transcribed, we must assume that the trial court did not err in its *Batson* ruling.[12]

3. Thomas also argues that the trial court erred by admitting his custodial statement, which he contends violated his *Miranda*[13] rights.

"When an appellate court reviews a trial court's grant or denial of a motion to suppress, the trial court's findings as to disputed facts will be upheld unless clearly erroneous[,] and the trial court's application of the law to undisputed facts is subject

---

[12] (Punctuation and footnote omitted.) Id. at 140 (6), quoting *Russell v. Parkford Management Co., Inc.*, 235 Ga. App. 81, 83 (2) (508 SE2d 454) (1998).

[13] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16LE2d 694) (1966).

to de novo review."[14] In this case, because the facts are undisputed, our review is de novo.[15]

Thomas was taken into custody at his home and transported to the police station, where he was placed in a six foot by six foot room, and his feet were shackled to the floor. At 4:20 p.m., Sergeant Ken Rogers entered the room, told Thomas that he was a suspect in their investigation of two robberies and that they needed to interview him, and then elicited from Thomas basic information including his name and date of birth.[16] Rogers then read Thomas his *Miranda* rights. Thomas responded "that he did not want to make a statement." Rogers "then spoke with him a couple – a little bit further[,] and [Thomas] basically said he had no knowledge of any robberies and that [the police] could just put him in jail." Rogers then left the room.

Thomas remained alone in the small interview room for more than three hours, during which time his feet were shackled to the floor, and he was not offered food, water, or the opportunity to use the restroom. Around 8:00 p.m., Rogers and another investigator approached Investigator James Kelly, advised him that Thomas was in

---

[14] *State v. Nash*, 279 Ga. 646, 648 (2) (619 SE2d 684) (2005).

[15] See *Mack v. State*, 296 Ga. 239, 241-242 (765 SE2d 896) (2014).

[16] This colloquy was not recorded.

8

the interview room and had refused to speak with them, and asked Kelly to go in and attempt to speak with Thomas.[17]

Kelly entered the interview room at 8:20 p.m. and began speaking with Thomas, "[a]dvis[ing him] that he needed to cooperate with the[] investigators." Kelly then told Thomas that Thomas's wife had made a statement to police incriminating Thomas. When Thomas responded that he did not believe Kelly, Kelly left the room, retrieved the audio recording of Thomas's wife's statement, and played a small portion of it for Thomas. Thomas then agreed to speak with the other investigators about the robbery, signed a *Miranda* waiver form, and gave a recorded statement detailing his involvement in the two robberies.

> In examining the operation of the Fifth Amendment's privilege against self-incrimination, the United States Supreme Court has made clear that when an individual in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." At this point, that individual "has shown that he intends to exercise his Fifth Amendment privilege; any statement

---

[17] At the suppression hearing, when asked why he sent Kelly in to speak with Thomas, Rogers replied, "[b]asically, what occurs is – my experience is if I interview somebody I may get nothing. Another investigator may go in there and get them to confess everything and anything. . . . So we customarily take turns at trying to get them to talk and so forth. It's not uncommon."

taken after the person invokes his privilege cannot be other than the product of compulsion."[18]

Here, Thomas unequivocally invoked his right to remain silent when he told Rogers that he "was not making a statement and that [the police] could just put him in jail."[19] The invocation itself, however, does not automatically require suppression of Thomas's statement because

> an accused's assertion of his right to remain silent effects neither a permanent immunity from further interrogation by the police nor a blanket prohibition on later statements made voluntarily by the accused. Rather, the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored by law enforcement authorities.[20]

---

[18] (Citation omitted.) Id. at 242 (1), quoting *Miranda*, 384 U. S. at 473-474 (III).

[19] See *Mack*, 296 Ga. at 242-243 (1) (defendant's statement that "I'm done. I have no more to say. I'm done. Let's ride," was an unequivocal assertion of the right to remain silent); *Green v. State*, 275 Ga. 569, 572-573 (2) (570 SE2d 207) (2002) (finding unequivocal assertion of right to remain silent when the defendant told police, "I don't want to talk.").

[20] (Citation and punctuation omitted.) *Mack*, 296 Ga. at 243 (2), quoting *Michigan v. Mosley*, 423 U. S. 96, 102, 104 (96 SCt. 321, 46 LE2d 313) (1975).

Factors in determining whether a defendant's assertion of his right to remain silent was scrupulously honored include whether police immediately ceased all questioning upon assertion and the time interval between the assertion and the subsequent police-initiated questioning.[21] After applying these factors, we conclude that Thomas's statement was improperly obtained.

First, Rogers admitted at the suppression hearing that after Thomas told him that he would not make a statement, Rogers "spoke with him a couple – a little bit further."[22] And less than four hours transpired before Rogers sent Kelly in to speak with Thomas. Thus, this short time interval weighs in favor of suppression.[23] Secondly, there is no evidence that Thomas initiated the conversation with Kelly. Instead, Kelly went into the room, without any communication from Thomas during the break after Rogers left the room, and Kelly immediately advised Thomas to cooperate and then began advising Thomas of his wife's statement incriminating him.

---

[21] See *Mack*, 296 Ga. at 243 (2).

[22] The record is silent as to the substance of the brief colloquy before Kelly left the interview room.

[23] See id. ("Although the Supreme Court of Georgia "[has] never established a bright line for what constitutes the requisite time interval in this regard, [it has] previously held . . . that a 17-hour overnight time lapse between assertion of the privilege and further police communications was not sufficient.").

11

Under these circumstances "the State has failed to satisfy its burden to establish an effective initiation by [Thomas]."[24] Accordingly, we hold that Thomas's statements made after he invoked his right to remain silent were improperly obtained.

Nevertheless, we find the error harmless in light of the overwhelming evidence of Thomas's guilt, including the gas station attendant's identification of him, the video surveillance footage of the two robberies, the multitude of items found in his bedroom linking him to the robberies, and the fact that his wife, who participated in the robbery of the Subway, was a disgruntled former employee of the restaurant.[25]

*Judgment affirmed. Phipps, P. J., and Boggs, J., concur.*

---

[24] (Punctuation omitted.) Id. at 249 (2).

[25] See *Arizona v. Fulminante*, 499 U. S. 279, 295 (IV) (111 SCt 1246, 113 LE2d 302) (1991) (stating that the "harmless-error analysis applies to coerced confessions"); *Richardson v. State*, 265 Ga. App. 711, 716 (1) (595 SE2d 565) (2004), disapproved on other grounds by *Brown v. State*, 290 Ga. 865, 869, n. 2 (725 SE2d 320) (2012); *Hadley v. State*, 235 Ga. App. 737, 738 (510 SE2d 569) (1998).