**WHOLE COURT**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
http://www.gaappeals.us/rules

**February 17, 2017**

# In the Court of Appeals of Georgia

A16A2147. CLAYTON v. THE STATE.                    DO-071 C

A16A2148. MINOR v. THE STATE.                    DO-072 C

DOYLE, Chief Judge.

Duvalle Rene Minor and Robert Anthony Clayton were jointly indicted, tried, and convicted of armed robbery and criminal attempt to commit armed robbery. Following the denial of their motions for a new trial, they appealed their convictions to this Court, and in a consolidated opinion in *Minor v. State* ("*Minor I*"),[1] the Court affirmed the judgments of conviction but remanded the cases for a new hearing to determine whether the State violated *Batson v. Kentucky*[2] when it peremptorily struck

---

[1] 328 Ga. App. 128 (761 SE2d 538) (2014).

[2] 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986).

Juror No. 31 from the venire.[3] On remand, the trial court held a hearing and found that no *Batson* violation had occurred. In Case No. A16A2147, Clayton appeals that ruling, and in Case No. A16A2148, Minor does the same. We have consolidated the appeals for review, and for the reasons that follow, we reverse.

*Relevant Facts*

As noted in the earlier appeal, the voir dire was not transcribed, but the record reflects that the State exercised nine strikes, six against African-American people and three against white people, and the resulting jury was composed of two African-American jurors and nine white jurors. After defense counsel[4] raised the *Batson* issue on this ground, the trial court "require[d] the State to articulate its reasons for the

---

[3] This Court held that two other *Batson* challenges made by Clayton were without merit. See *Minor*, 328 Ga. App. at 140 (6). The Court also held that the evidence sufficed to support the convictions, the defendants did not receive ineffective assistance of trial counsel, the trial court did not improperly invade the province of the jury, and the trial court did not improperly charge the jury on the burden of proof. See id. at 129-145 (1)-(8).

[4] The *Batson* motion was first announced by Clayton's trial counsel, but Minor's counsel participated in the argument, and both joined the motion. For purposes of this appeal, we treat their *Batson* arguments jointly.

peremptory strikes, rendering moot the issue of whether [defense counsel] had established a prima facie case."[5]

The State gave as its reasons for striking Juror No. 31 as follows:

[The juror] has a conviction for theft by receiving. This is a theft-related case. [The juror] also has gold teeth. Now, that's not a definitive factor, but the fact of the matter is, in general, when I see jurors who have gold teeth that's – I just don't like that so I don't think that's race. If they were white and had gold teeth I would have the same reaction. But it's primarily the theft, the fact that he has a theft of a motorcycle, that charge.

Defense counsel then countered that the alleged theft charge was actually a misdemeanor criminal damage charge, and he began to challenge the State's proffered gold-teeth rationale when the trial court cut him off:

Defense counsel: Your Honor, I believe it was clear that it wasn't a theft. . . He was charged with misdemeanor criminal damage. It wasn't a felony that was knocked down to a misdemeanor. It started as a misdemeanor, and I don't see the issue there. Regarding gold teeth –

Trial court: I'm not impressed by the gold[-]teeth argument. I'm not impressed by his gold[-]teeth argument.

---

[5] *Arrington v. State*, 286 Ga. 335, 339 (9) (687 SE2d 438) (2009).

3

Defense counsel: Neither am I, and neither was – I believe his name was David, on record. It was a case I tried with Mr. Knighton –

Trial court: Okay. Let's not go there. I said *I'm not going to accept the [State's] gold[-]teeth argument*.[6] Do you want to talk me out of it?

Defense counsel: You say you're not impressed with it. I'm good with that.

Trial court: No, he was charged with a theft. This was an interesting jury, quite frankly. An interesting jury panel – and we do have some folks on there who have had some charges, because there just wasn't any way for everybody – to get everybody off. But I do find it to be race neutral. And the last strike was of a white female. So I deny the *Batson* [c]hallenge.

In *Minor I*, this Court held that the above colloquy showed that the trial court failed to allow defense counsel to fully articulate "that the prosecution's strike based on Juror No. 31's gold teeth arose from a racial stereotype," so the record was

---

[6] (Emphasis supplied.)

4

incomplete with respect to the requisite findings under *Batson*.[7] Having so found, this Court:

> remand[ed] the case in order to permit the defense to [fully explain its argument that the strike was racially discriminatory] and to allow the trial court to make findings under *Batson*. Should the trial court determine that the State did not fulfill its burden to provide racially-neutral reasons, a new trial is in order. Should the trial court determine that no *Batson* violation occurred, appellant's convictions will remain in effect.[8]

On remand, the trial court held a hearing in which she limited the argument to address only the gold-teeth rationale as to Juror No. 31, and defense counsel outlined their objections. Defense counsel explained that the State's gold-teeth rationale was a race-based stereotype of African-American culture, and the State's reliance on Juror No. 31's alleged involvement in the theft of a motorcycle was merely a pretext for the

---

[7] *Minor*, 328 Ga. App. at 138 (4). Another reading of the trial court's ultimate analysis in *Minor I* is that the court used a "dual motivation" or "mixed motive" approach and found no *Batson* violation because the prosecutor would have properly struck the juror even without the stated discriminatory reason. Compare *United States v. Tokars*, 95 F.3d 1520, 1533 (IV) (11th Cir. Ga. 1996) (noting adoption by 11th Circuit of the dual motivation analysis); *Guzman v. State*, 85 S.W.3d 242, 247 (Tex. Crim. App. 2002) (outlining dual or mixed motivation analysis). As explained below, that approach is not followed under current Georgia law.

[8] (Punctuation omitted.) *Minor*, 328 Ga. App. at 139 (4).

State's explicitly race-based strike. The State responded by re-stating that its rationale was based on both the juror's criminal history and the fact that he had gold teeth. The prosecutor explained:

> My recollection is actually . . . it was actually gold teeth. I think it was his entire mouth. I don't believe that is race related. I think it's something that you choose. You go to the dentist. You decide what you want. You get that cosmetic.

> I think around the time period of this trial . . . there [was] Ryan Lochte at the Olympics put on the gold teeth[,] and there was this attitude or there were these other people who were wearing this. I don't think it's race related. I don't consider it race related.

> And for me, the gold[-]teeth issue is similar – there are a lot of people who have a, I guess, an interest[,] and they'll [dye] their hair blue or they'll [dye] their hair red. There are people who wear nose rings or have eyebrow rings. I don't think that . . . makes them a bad person, but I think what it says to them is they are purposely setting themselves apart. They're being iconoclastic. They want to look different from the normal person. . . [T]hat is telling me . . . a little bit about the thinking of that person. . . And that, in combination with the fact that he was arrested for felony theft of a motorcycle and was pled down to theft by receiving of a motorcycle, forms a picture for me of that juror and what is going on in his mind. . . It has nothing to do with race.

On rebuttal, defense counsel reiterated the argument that gold teeth are a stereotype associated with the African-American community.

Based on the State's explanation, the trial court held that the State's reasons for striking Juror No. 31 were race neutral. With respect to the gold-teeth argument, the trial court made no express findings as to whether having gold teeth was a race-based stereotype, but accepted the State's explanation that it would strike a juror with gold teeth regardless of race: "The Court finds that this is a race[-]neutral explanation. Jurors who want to be different i[n] such an obvious way do not usually make good jurors, they tend to not want to go along with the majority in reaching a verdict. They want to be different." Thus, the court held that no *Batson* violation had occurred. Minor and Clayton now appeal from that ruling.

*Legal Analysis*

> The analysis of a *Batson* challenge involves a three-step process: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven [the proponent's] discriminatory intent.[9]

---

[9] (Punctuation omitted.) *Toomer v. State*, 292 Ga. 49, 52 (2) (a) (734 SE2d 333) (2012).

The focus of this case is on step two of the *Batson* process. Rulings made at this step

> are entitled to no deference [on appeal]. There are numerous appellate decisions ruling as a matter of law that proffered explanations were or were not race-neutral. Therefore, in practice, appellate review after a step two ruling is de novo. . . . [O]ur review of rulings at stage two is analogous to our rulings on motions for summary judgment or to our former rulings on demurrers in common law.[10]

With respect to the State's burden at step two as the proponent of the strike, the State

> need only articulate a *facially race-neutral* reason for the strike. Step two does not demand an explanation that is persuasive, or even plausible. At this second step of the inquiry, *the issue is the facial validity of the prosecutor's explanation*. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.[11]

It is well-settled that, at least in the context of a criminal trial, "[a] prospective juror's criminal history is an adequate race-neutral reason to" exercise a peremptory

---

[10] (Punctuation omitted.) *Goldberg v. State*, 280 Ga. App. 600, 602 (1) (634 SE2d 419) (2006).

[11] (Punctuation omitted; emphasis supplied.) *Toomer*, 292 Ga. at 54 (2) (b), quoting *Purkett v. Elem*, 514 U. S. 765, 768 (115 SCt 1769, 131 LE2d 834) (1995).

strike.[12] "A reasonable suspicion about a prospective juror's impartiality [towards the State] that falls short of justifying an excusal for cause might well justify the exercise of a peremptory strike."[13] Thus, the State's reliance on Juror No. 31's criminal history was a valid, race-neutral reason to exercise the strike.

Nevertheless, also at step two of the *Batson* process, the State explicitly relied on the fact that Juror No. 31 had gold teeth in his "entire mouth." "Our precedent states that an explanation is not racially neutral if it is based upon either a characteristic that is specific to a racial group or a stereotypical belief that is imputed to a particular race."[14] Thus, although the State argued otherwise,[15] we cannot ignore

---

[12] *Jackson v. State*, 288 Ga. App. 339, 344 (1) (b) (ii) (654 SE2d 137) (2007), citing *Dukes v. State*, 273 Ga. 890, 891-892 (2) (548 SE2d 328) (2001); *Williams v. State*, 271 Ga. 323, 325 (2), n. 3 (519 SE2d 232) (1999). See also *Alexander v. State*, 273 Ga. 311, 312 (2) (540 SE2d 196) (2001) (holding that the criminal arrest history even of a juror's family members "is a sufficiently race-neutral reason to satisfy the dictates of *Batson*").

[13] (Punctuation omitted.) *Floyd v. State*, 272 Ga. 65, 68 (3) (525 SE2d 683) (2000).

[14] *Dukes*, 273 Ga. at 891 (2). See also *Lewis v. State*, 262 Ga. 679, 680 (2) (424 SE2d 626) (1993) ("The exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party.") (punctuation omitted).

[15] As noted above, the State argued in part that Olympic swimmer Ryan Lochte's notorious display of a "grill" during the 2016 Summer Olympics shows that

the fact that having a full mouth of gold teeth is a cultural proxy stereotypically

associated with African-Americans.[16]As with most stereotypes, this characteristic is

_____

white people also have gold teeth because Lochte is white. But the fact that a fashion idiom has developed in popular culture does not negate its stereotypical nature, even when applied with an ostensibly positive or celebratory intent. The State also argues that the gold teeth were comparable to unusual adornment, such as an eyebrow ring, citing *Chandler v. State*, 281 Ga. 712, 716-717 (3) (642 SE2d 646) (2007), which deemed having such "body art" to be race neutral. But the *Chandler* opinion notes that an eyebrow ring does not implicate a racial stereotype, citing by comparison *Rector v. State*, 213 Ga. App. 450, 454 (2) (444 SE2d 862) (1994), which, as more fully explained below, adopted a trial court's finding that having a gold tooth was not an acceptable race-neutral rationale for striking a juror. See *Chandler*, 281 Ga. at 717 (3), citing *Rector*, 213 Ga. App. at 454 (2).

[16] See *Rector*, 213 Ga. App. at 454 (no abuse of discretion in ruling that having gold teeth is a racial stereotype under *Batson*). See also *January v. Outokumpu Stainless USA, LLC*, No. 15-00040 (S.D. Ala. Jul. 28, 2016) (memorandum opinion in an employment discrimination case recounting a fellow employee's bigoted comment "that only black people wear gold teeth and if a white employee spent too much time around the [African-American] Plaintiff, he would begin wearing gold teeth also"); *Medina v. Secretary, Dept. of Corrections*, No. 11-20907 (S.D. Fla. Nov. 24, 2015) (prosecutor criticized the defendant's allegedly fabricated defense as a "racist stereotype" implicating "some young black guy . . . [with] gold teeth"); *Sears v. Home Depot, USA, Inc.*, 943 S2d 1219, 1231-1232 (La. Ct. App. 2006) (noting in an employment discrimination case that a fellow employee's comment that "he would have to buy sunglasses because [an] African-American [co-worker] had so many gold teeth" was part of a series of racially "insensitive [remarks] reflecting profound ignorance on the part of the speaker"); *Yancey v. Sheriff of Jefferson County*, No. 2002-CA-00029 (Ky. Ct. App. Feb. 20, 2004) (unpublished) (noting in an employment discrimination case brought by an African-American plaintiff that a comment that "everybody down there had gold teeth in their mouth" was "mildly offensive"). See also Urban Dictionary, http://www.urbandictionary.com/define.php?term=gold+teeth (retrieved Jan. 4, 2017)

not couched in terms that explicitly reference race – nothing about having gold teeth

describes skin tone in a literal sense – but it has widely operated as a proxy for the

African-American race (or a subset of that race).[17] The dissent by Judge McFadden

points out that having gold teeth is iconoclastic, which could be a valid objection to

a juror if it were a race-neutral iconoclasm such as dying hair unnatural colors or

having unusual visible tattoos. But the potential iconoclasm of having gold teeth does

not negate its usage in American culture as a stereotypical proxy for (or association

---

(noting the origin of obtaining gold teeth as a sign of freedom and wealth among emancipated slaves as well as general contemporary adaptation in hip hop culture). Compare *Fields v. State*, No. 05-02-01665-CR (Tex. Crim. App. Jan. 14, 2004) (unpublished) (employing mixed motive analysis and finding no *Batson* violation based on a stated gold-teeth rationale because "there was no statistical information presented to show whether African[-] Americans have more gold teeth . . . [and] the prosecutor stated that [the juror] had been white, he would have struck him" for the same reason) (punctuation omitted); *Hayes v. State*, 2003 Tex. App. LEXIS 3827 (Tex. Ct. App. May 1, 2003) (unpublished) (employing mixed motive analysis and listing gold teeth along with other race-neutral reasons such as "body language"). Although a number of the above cases are unpublished, we do not rely on their precedential value in articulating a legal rule. Instead, these cases demonstrate the use of gold teeth as a racial stereotype in American culture.

[17] The fact that a racial stereotype is intended to describe only a subgroup of a particular race does not make it permissible under *Batson*. See, e.g., *Payton v. Kearse*, 329 S.C. 51, 56 (495 SE2d 205) (1998) (granting a new trial based on a party's strike of a "redneck," noting that the term "stereotypes a subgroup of the white race").

11

with) the African-American race.[18] Under these circumstances, striking the African-American juror because he had a full set of gold teeth cannot be said to be race neutral.

Because articulating a racial stereotype is not facially race-neutral, the State failed to meet its burden at *Batson* step two to articulate a facially race-neutral reason for the strike, even if the State attempted to rationalize its reason in purportedly race-neutral terms.[19] As stated by the U.S. Supreme Court in *Purkett v. Elem*, "[i]t is not until the third step that the persuasiveness of the [race-neutral] justification [given at step two] becomes relevant. . . ."[20] This contemplates that a race-neutral reason was

---

[18] The existence of this stereotype was explicitly identified by defense counsel at the original hearing and on remand, and it was implicitly noted by the trial court during the *Batson* challenge when she immediately interrupted defense counsel as he began to address the State's gold-teeth rationale and said, "I'm not impressed by the [State's] gold[-]teeth argument. I'm not impressed by his gold[-]teeth argument . . . *I'm not going to accept the gold[-]teeth*" rationale from the State. (Emphasis supplied.)

[19] See *Toomer*, 292 Ga. 49, 54 (2) (b) ("The explanation for the strike . . . needs to be facially race-neutral."). We note that nothing in the record demonstrates any actual racial animosity on the part of the prosecutor in justifying his strike. But this does not relieve the State of its burden to articulate a race-neutral basis for the strike. See generally *Toomer*, 292 Ga. at 55 (2) (b) (stating that the overarching goal of *Batson* is ensuring that considerations of "race and gender [have] no place in the administration of justice").

[20] *Purkett*, 514 U.S. at 768.

given at step two. Here, because the State failed to meet its burden in step two, the prosecutor's justification for offering a facially discriminatory rationale is not relevant, and we need not reach step three of the *Batson* analysis, as the dissents do.

Having determined that the State's reliance on the juror's gold teeth did not satisfy its burden at step two of *Batson*, we next look at whether having an alternative reason for the strike (the juror's criminal history) saves the strike. In this circumstance, Georgia law holds that a *Batson* violation results from a race-based reason even if it is accompanied by a race-neutral reason. In *Rector v. State*,[21] the

---

[21] 213 Ga. App. 450. We respectfully disagree with Judge Self's characterization that *Rector* was disapproved by the Supreme Court of Georgia in *Toomer*. While *Toomer* does disapprove of any requirement for case-relatedness in step two of *Batson*, *Rector* was focused on the existence of race neutrality, not case-relatedness. As this Court explained in *Rector*, "[i]n the case sub judice, the trial court was concerned 'about the gold tooth and the gold in the mouth explanation given by the State *and she questioned whether that is a racially neutral reason or whether that's a stereotype*.'" (Emphasis supplied; punctuation omitted.) *Rector*, 213 Ga. App. at 454. Thus, this Court did not reverse in *Rector* because the State failed to meet a case-relatedness requirement; the Court reversed because the State failed to meet the race-neutral requirement. Put another way, no longer requiring parties to articulate reasons related to the case does not relieve them of their obligation to justify their strikes with race-neutral reasons. That *Rector* couched its conclusion in terms of case-relatedness merely reflects the terminology applicable at the time, as well as the enduring fact that "race and gender [have] no place in the administration of justice." *Toomer*, 292 Ga. at 55 (2) (b). But it remains good law that articulating a race-based reason (also unrelated to the case) is insufficient to meet a party's burden at step two under *Batson*. See *Toomer*, 292 Ga. at 54 (2) (b) ("The [step two] explanation for the strike only needs to be facially race-neutral.") Nothing in *Toomer* changed this.

13

prosecutor justified his strike of an African-American juror based in part on her "big gold tooth with a pattern on it right in the front of her mouth."[22] The State also articulated other ostensibly race-neutral bases, such as having only a high-school education, exhibiting a lack of general intelligence, not knowing where her sons worked as janitors, and having a meager employment history.[23] After hearing from counsel, the trial court ruled that the gold-tooth explanation "in and of itself" would not be accepted due to its stereotypical nature, but the other stated reasons properly justified the strike as race-neutral.[24] On appeal, this Court reversed and held that the trial court "erred in ruling that other purportedly race[-]neutral explanations cured the element of the stereotypical reasoning employed by the State's attorney in exercising a peremptory strike."[25] The Court explained that "[e]ven though the State's attorney may have given other racially neutral explanations, the trial court's finding of one

---

[22] Id. at 452 (2).

[23] See id.

[24] Id. at 454 (2).

[25] Id. This Court reversed in *Rector* despite the State's argument that "having a gold tooth in the front of your mouth is almost a kind of a -- I don't know. It's kind of cool or something like that. It's almost a thumb your nose at society kind of thing to me." Id. at 453 (2).

14

racially motivated explanation vitiates the legitimacy of the entire jury selection procedure."[26] As noted by the Georgia Supreme Court in *Lingo v. State*,[27] if "racially-neutral and neutrally applied reasons are given for a strike, the simultaneous existence of any [facially] racially motivated explanation results in a *Batson*

---

[26] (Punctuation omitted.) Id. at 454-455. As noted in footnote six, at the initial *Batson* hearing, the trial court appears to have engaged in an approach adopted in other jurisdictions known as the "dual motivation" or "mixed motivation" analysis. See, e.g., *Tokars*, 95 F.3d at 1533 (IV) (discussing the dual motivation analysis); *Guzman*, 85 S.W.3d at 247 (outlining dual or mixed motivation analysis). Under that approach, a strike proponent who articulates a facially discriminatory reason still has an opportunity to prove "by a preponderance of the evidence that the strike would have been exercised even in the absence of the discriminatory motivation." *Tokars*, 95 F3d at 1533 (IV) (addressing a facially discriminatory reason but affirming a finding of neutrality because of other concurrent, non-pretextual neutral reasons for the strike). This approach is not consistent with Georgia's current case law.

[27] 263 Ga. 664 (437 SE2d 463) (1993).

violation."[28] In short, under current Georgia law, an alternative race-neutral basis does not cure the facially race-based reason given by the State.

Accordingly, the trial court erred by finding there was no *Batson* violation, and we therefore reverse the trial court's judgment denying the motions for new trial filed by Minor and Clayton.[29]

*Judgments reversed in Case Nos. A16A2147 and A16A2148. Barnes, P. J. , Miller, P. J., and McMillian, J., concur. Andrews, J., concurs in judgment only. McFadden, P. J., Ray, Rickman, and Self, JJ., dissent.*

---

[28] Id. at 668 n. 4 (1) (c) (discussing cases collected in *Strozier v. Clark*, 206 Ga. App. 85, 88 (424 SE2d 368) (1992)). See, e.g., *State v. Tomlin*, 299 S.C. 294, 299 (384 SE2d 707) (1989) (reversing and holding that the juror's demeanor was a permissible basis for a strike under *Batson* but the prosecutor's characterization that the African-American juror "shucked and jived" as he walked to the microphone was a racial stereotype that "clearly violates the mandates of *Batson*") (punctuation omitted). Compare *Knuckles v. State*, 236 Ga. App. 449, 451-453 (1) (a), (b) (512 SE2d 333) (1999) (affirming a conviction and finding that no *Batson* violation occurred despite the trial court's inferential finding of a pattern of discrimination because a race-neutral reason (nose ring) was given and there was no *facially* racially race-based reason given). In *Strozier*, the second reason given was facially race-based, so this pervaded the exercise of the strike no matter what other neutral reasons were given. See *Strozier*, 263 Ga. at 87 (5).

[29] See *Rector*, 213 Ga. App. at 455 (2).

16

A16A2147. CLAYTON v. THE STATE.               DO-071C

A16A2148. MINOR v. THE STATE.                DO-072C


RAY, Judge.

Like the majority, when I read the briefs in this case and began to study the case file, I was uneasy with the decision of the State to strike the prospective juror based, in part, on the fact that he had gold teeth. In our racially diverse society, I understand the value in having juries which are selected to settle our civil and criminal matters reflect the diversity of their communities. Thus, I understand why these cases landed in the Court of Appeals to examine whether the State violated *Batson v. Kentucky* in striking Juror No. 31.

Yet, unlike the majority which finds that the State impermissively relied on a racial stereotype in striking Juror No. 31, I do not believe that the State's motivation in striking this juror is so clear cut. Juror No. 31 had previously been charged with a felony theft, such charge which had been negotiated down to a misdemeanor criminal damage charge to which he pled guilty.[1] During my nearly 11 years on the trial bench, I don't believe that I ever presided over a case where the State allowed anyone who had a conviction for anything more than a routine traffic offense to be seated on the jury. As I understand it, prosecutors are afraid to allow a person who has previously been charged with a crime, much less convicted of one, to serve on a jury, as such individual might be mad at the authorities due to his or her own experience in the criminal justice system, or might be more sympathetic with or identify with the accused.

In its opinion, the majority concludes that the State's decision to strike Juror No 31 was, essentially, illegal per se.[2] However, that is not what the trial court

---

[1] Apparently, the prosecutor and defense counsel cannot agree as to which charge this juror faced before his plea negotiations, and there is no transcript of voir dire to aid us in our review. Thus, I have relied on the trial court's conclusion as to this point as found in its order dated March 10, 2015.

[2] The majority cites to this Court's ruling in *Rector v. State*, 213 Ga. App. 450 (444 SE2d 862) (1994), to support its holding. However, I point out that the trial

2

concluded upon remand.   And, while I certainly agree that the striking of a African-American juror because he or she has gold teeth might be discriminatory, I do not believe that to be automatically so.   Specifically, the trial court found that  the State proffered a race neutral explanation for the strike, that is, that a person who has the entirety of his teeth encased in gold crowns, whatever his or her race, seeks  "to look different from the rest of the world, and be different from everyone else," much like "people who [have] dyed their hair blue, or [have] nose rings and so forth."  The trial court concluded that potential jurors "who want to be different in such an obvious way do not usually make good jurors, they tend to not want to go along with the majority in reaching a verdict.  They want to be different."  In accepting this basis for the strike, the trial court concluded that the Defendants did not prove discriminatory intent.[3]  Of course, a "trial court's finding as to whether the opponent of a strike has

court in *Rector* did not accept the prosecutor's rationale why he had struck the juror. We held that there was no abuse of discretion in the trial court's ruling that the prosecutor's logic was not race neutral.  Of course, in this case, the trial court found that the prosecutor's reasons for striking the juror were race neutral.

[3] I note that at no time did the Defendants introduce any evidence with regard to the history of gold teeth in the African American community, discrimination against individuals who have gold teeth, or anything else.  The Defendants relied solely on their attorneys' arguments.

3

proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous." *Woodall v. State*, 294 Ga 624, 627 (3) (754 SE2d 335).

Had I been the presiding judge in this case, I may very well have not accepted the State's rationale for exercising this strike. Yet, the trial court judge who both presided at the original jury selection and conducted the hearing on this issue upon remand believed that the State did not discriminate and had a legitimate purpose in striking this juror. Indeed, even the majority concludes in its opinion that the transcript does not reveal any actual racial animosity on the part of the prosecutor.

Let me state clearly that I agree that the use of a racial stereotype to eliminate a potential juror is wrong and, indeed, prohibited by our law. However, I am not prepared to say that such was the situation here under the totality of the circumstances and in light of the trial court's decision after carefully considering the facts of this case, listening to the prosecutor and his rationale, evaluating his demeanor and his credibility, and considering the genuiness of his character.

Accordingly, I believe that as a court for the correction of errors of law and not for deciding disputed issues of fact, we are bound to accept the conclusion of the trial court that the Defendants have not proven a discriminatory intent in the striking of Juror No. 31 and believe that the trial court did not clearly err. I recognize that other

4

trial judges may have reached a different conclusion if faced with these facts at trial; yet, I do not believe that these facts demand a conclusion as a matter of law that the State violated *Batson* with its use of a peremptory strike to remove this juror.

Accordingly, I hereby dissent.

I am authorized to state that McFadden, P. J., Rickman and Self, JJ., join in this dissent.

A16A2147. CLAYTON v. THE STATE.

A16A2148. MINOR v. THE STATE.

McFADDEN, Presiding Judge, dissenting.

I respectfully dissent. I join fully in Judge Ray's dissent and expressly associate myself with his reaffirmation of the importance of diverse juries. I write separately to identify what I see as the flaw in the majority's analysis.

The majority errs in equating a characteristic "specific to" a group with a stereotype about that group. The Oxford University Press dictionary defines "stereotype" in this sense to mean "a preconceived and over-simplified idea of the characteristics which typify a person or thing." So if an individual prospective juror has a trait about which a party has a genuine non-discriminatory concern, a concern

not founded on a stereotype, then a strike is not discriminatory — even if the characteristic is "specific to," or even part of a stereotype about, a class of which the prospective juror is a member.

For example, assume a hypothetical protected class whose members are stereotyped as belligerent drunkards. Striking a prospective juror for being a member of that class would be discriminatory; but striking a prospective juror for being a belligerent drunkard would not — whether or not the prospective juror is a member of that class.

In the case before us today, the trial court was authorized to find, as the prosecution argued, that gold teeth — like nose rings, eyebrow rings, and bright blue hair — are a statement of iconoclasm. Conversely, I agree that she would have been authorized to find, as the defense argued, that gold teeth are "commonly associated" with "the black community." See *Rector v. State*, 213 Ga. App. 450, 454 (2) (444 SE2d 862) (1994) (finding no abuse of discretion in trial court's refusal to accept prosecutor's explanation that striking a juror with a gold tooth, "in and of itself," was a racially neutral reason). And I assume, as the majority holds, that she was required to find that they are "specific to" that community.

So the trial court was authorized to find — and did find — that, in striking a prospective juror because of his gold teeth, the prosecutor was trying to avoid seating iconoclasts, a race-neutral reason unexceptionable under *Batson*. She would also have been authorized to find that the prosecutor had a discriminatory motive prohibited by *Batson*. And she would have been authorized to find both motivations mixed together, which, as the majority explains, would also have been a violation of *Batson*, as it has been construed in Georgia.

Each of those findings would have been sustainable. We remanded so that the trial court could make that determination. She has done so. She accepted the prosecution's race-neutral explanation, rejected the defense's claim of a discriminatory intent, and so upheld the strike. And contrary to the majority, she made clear her understanding that in Georgia a mixed motive is a discriminatory motive.

I would affirm.

A16A2147. CLAYTON v. THE STATE.

A16A2148. MINOR v. THE STATE.

SELF, Judge, dissenting.

I join fully with Judge Ray's dissent and his view that our previous decision

in *Rector v. State*, 213 Ga. App. 450 (444 SE2d 862) (1994) can be distinguished

based upon the procedural posture of the case on appeal and its facts. I write

separately to point out that our decision in *Rector* has been disapproved by the

Supreme Court of Georgia in *Toomer v. State*, 292 Ga. 49 (734 SE2d 333) (2012),

and was decided before a seminal United States Supreme Court decision clarifying

step two of the *Batson v. Kentucky*[1] analysis. *Purkett v. Elem*, 514 U. S. 765 (115 SCt

---

[1] 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986).

1769, 131 LE2d 834) (1995). Because *Rector* has such limited precedential value, I cannot agree with the majority's decision to so heavily rely upon it in reversing the trial court.

At the time *Rector* was decided in 1994, the Georgia Supreme Court required the proponent of a strike to state a "racially neutral, *case-related* explanation of the exercise of the challenged strikes" in step two of the *Batson* analysis. (Emphasis supplied.) *Congdon v. State*, 262 Ga. 683, 684 (424 SE2d 630) (1993). Following the United States Supreme Court's decision in *Purkett*, however, the Georgia Supreme Court disapproved statements "in some of our older cases suggesting that at *Batson* step two, the proponent of the challenged strike can carry his burden of production only by offering an explanation that is 'case-related' and 'specific' in addition to being race-neutral." *Toomer*, supra, 292 Ga. at 53-54 (2) (b). Instead, our Supreme Court clarified:

> At step two, the proponent of the strike need only articulate a *facially* race-neutral reason for the strike. Step two does not demand an explanation that is persuasive, or even plausible. At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

2

(Citations and punctuation omitted; emphasis supplied.) Id.

Keeping in mind the state of the law at the time *Rector* was decided, an examination of our holding in that case reveals that it turned upon the prosecutor's failure "to explain how the prospective juror's gold tooth *related in any way to the outcome of the case sub judice* and the trial court ruled that she would not accept that explanation in and of itself." (Punctuation omitted; emphasis supplied.) *Rector*, 213 Ga. App. at 454 (2). We found "no abuse of discretion in this ruling[.]" Id. Based upon the State's failure to make any case-related showing in connection with its gold-tooth explanation for the strike, the trial court's decision not to accept it "in and of itself" was consistent with then-existing law. Given the State's failure to proffer a case-related reason for its strike, our conclusion that the trial court had not abused its discretion in so holding was also consistent with the law in effect at that time.[2]

---

[2] While the abuse of discretion standard of review was correct based upon the State's failure to offer the case-related reason for the strike, I note that this standard of review is no longer viable for step two of the *Batson* analysis. As we explained in a case decided after *Purkett*, "if a trial court ceases its inquiry after step two, the proffering of allegedly race-neutral reasons, its conclusions are entitled to no deference. . . . [O]ur review of rulings at stage two is analogous to our rulings on motions for summary judgment or to our former rulings on demurrer in common law." (Citation, punctuation and footnote omitted.) *Goldberg v. State*, 280 Ga. App. 600, 601-602 (634 SE2d 419) (2006).

3

We nonetheless reversed the trial court in *Rector*, because it "erred in ruling that other purportedly race neutral explanations cured the element of the stereotypical reasoning employed by the State's attorney in exercising a peremptory strike." Id. Our shorthand reference of "stereotypical reasoning" to our previous analysis of step two should not, however, be interpreted as a holding that a gold tooth equates with a stereotypical belief as a matter of law. See *George v. State*, 263 Ga. App. 541, 545 (2) (b) (588 SE2d 312) (2003) (summarizing our holding in *Rector* as "improper stereotyping where state failed to explain how prospective juror's gold tooth related to case"), disapproved on other grounds, *Littlejohn v. State*, 320 Ga. App. 197, 202 (1) (c), n. 3 (739 SE2d 682) (2013) (noting that *George* is overruled to the extent it was based upon standard disapproved in *Toomer*, supra). Clearly, our decision in *Rector* rested upon the State's failure to provide a case-related explanation for its peremptory strike. But the Georgia Supreme Court has now expressly disapproved of that portion[3] of the decision. *Toomer*, supra, 292 Ga. at 54 (2) (b) (holding "explanation need not even be 'case-related'" and stating "[a]ny statements to the

---

[3] Our conclusion in *Rector* that other race-neutral explanations for a peremptory strike do not cure an improper explanation at step two of the *Batson* analysis remains valid. 213 Ga. App. at 454 (2).

4

contrary in [four identified cases] and *any other Georgia case* are hereby disapproved") (citations and footnote omitted; emphasis supplied).

After the Supreme Court's decision in *Purkett*, supra, "*facial neutrality* became paramount." (Emphasis supplied.) Page, "Batson's-Blind Spot: Unconscious Stereotyping and the Peremptory Challenge," 85 Boston Univ. L. Rev. 155, 167 (I) (C) (2) (2005). But nowhere in *Rector* did we consider, much less definitively decide, whether striking an African-American juror based upon gold teeth is *facially* race-neutral. Instead, we straightforwardly applied the law in effect at the time of our decision. With regard to step two, we summarized the State's obligation as follows: "'In order for the State to carry its *Batson* burden, the prosecutor (must) explain his striking of the jurors at issue by articulating *a racially-neutral reason related to the particular case*.' [Cit.]" (Emphasis supplied.) 213 Ga. App. at 451 (2). This standard intertwined case-relatedness with racially neutral reasons for a strike and made no mention of *facial* neutrality. Based upon the law at the time *Rector* was decided and the particular language used in our decision to explain both the legal standard and our holding, we simply cannot disentangle any statements about "stereotypical reasoning" in that case from portions of the analysis resting upon prior law. And this loose and

5

inartful language should certainly not be equated with a ruling on whether a gold tooth constitutes a facially race-neutral explanation for a peremptory jury strike.

Notwithstanding *Rector*'s limited precedential value, the majority relies upon this disapproved case to stake out its position and hold for the first time that any party who strikes an African-American juror because he or she has gold teeth can *never* provide a race-neutral explanation and will always fail the second step of the *Batson* analysis. According to the majority, the State's explanation was not facially race-neutral because "having a mouth full of gold teeth is a cultural proxy stereotypically associated with African Americans" *as a matter of law*. I respectfully disagree.

The standard for step two of the *Batson* analysis is not whether an explanation "is a cultural proxy stereotypically associated with [a race]." Instead, "the issue is the facial validity of the prosecutor's explanation. Unless *a discriminatory intent is inherent in the prosecutor's explanation*, the reason offered will be deemed face neutral."[4] (Emphasis supplied.) *Toomer*, supra, 292 Ga. at 54 (2) (b). In *Purkett*, the

---

[4] In considering this question under *Batson*, the Georgia Supreme Court has rejected an argument that Georgia should apply "the Georgia Constitution's equal protection guarantee differently than the equal protection clause in the Fourteenth Amendment to the United States Constitution. . . ." Id. at 54 (2) (b), n. 3. See *Batson*, supra, 476 U. S. at 86 ("The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race.").

United States Supreme Court examined this question and concluded that the growing of long, unkempt hair "'is not a characteristic that is peculiar to any race.'" 514 U. S. at 769. And in *Hernandez v. New York*, it explained that a "neutral explanation . . . means an explanation based on something other than the race of the juror." 500 U. S. 352, 360 (II) (B) (111 SCt 1859, 114 LE2d 395) (1991) (plurality opinion). See also *Willis v. State*, 287 Ga. 703, 708 (6) (699 SE2d 1) (2010) (finding "State's tendered reasons were 'based on something other than the race of the juror' and, thus, were facially race-neutral," citing *Hernandez*, supra). After *Purkett*, our courts began analyzing the explanation offered at step two of the *Batson* analysis to determine whether a proffered reason was "based on a stereotypical belief or a characteristic peculiar to any race." *Barnes v. State*, 269 Ga. 345, 350 (6) (496 SE2d 674) (1998). See also *Wheeler v. State*, 249 Ga. App. 116, 117 (1) (547 SE2d 746) (2001) (explanation for strike is "not race-neutral if it is based on a characteristic peculiar to any race or on a stereotypical belief"). As we explained in *Knuckles v. State*:

> unusual way[s] to wear jewelry, as well as other unconventional methods of self-adornment in attire, hair style, hair color, shaving the head, jewelry, tattoos, or scarification, may indicate youthful rebellion against authority and convention, or anti-social attitudes, or identification that would extend across gender and racial lines. Such may constitute a race/gender-neutral reason to strike. However, if such

7

matters were shown to be *unique* to a racial or gender identification, then it could constitute an impermissible explanation. However, such exclusive identification with race or gender would be part of the movant's ultimate burden of persuasion.

(Emphasis in original.) 236 Ga. App. 449, 452-453 (1) (512 SE2d 333) (1999).

In *Wooten v. Castro*, the Ninth Circuit Court of Appeals addressed a similar issue and resolved it as follows:

The prosecutor's second explanation was [the juror]'s appearance. The California Court of Appeal[s] adopted the trial court's finding that this reason was race-neutral. Nonetheless, as noted by the district court, certain parts of the description of [the juror]'s appearance could arguably be seen as "proxies" for describing young African-American males. The description of [the juror]'s appearance, however, is not "peculiar" to his race. *Purkett v. Elem*, 514 U. S. 765, 769, (115 SCt 1769, 131 LEd 2d 834) (1995) (per curiam) (finding race-neutral an explanation that African-American juror was struck because he had long, curly, unkempt hair, a mustache, and beard) . . .[.] Thus, while the appearance-related criteria used by the prosecutor to strike [the juror] may disproportionately apply to young, African-American males, it is race-neutral because it is not unique to this group. See *Purkett*, 514 U.S. at 769.

(Citation omitted.) 130 Fed. Appx. 106, 107-108 (9th Cir. 2005), cert. denied, 546 U. S. 868 (2005). Other jurisdictions have also concluded that the exercise of

8

peremptory strikes based upon grooming and appearance choices that might be associated with one race more than another do not violate *Batson*. *Lacey v. Kramer*, Case No. 2:07-cv-02640-VAP (HC), 2010 U. S. Dist. LEXIS 46603 at ** 4-7 (I) (A) (2), 15-19 (III) (B) (E.D. Cal. 2010) (dreadlocks); *Fields v. State*, Case No. 05-02-01665-CR, 2004 Tex. App. LEXIS 340 at *6-7 (Tex. Ct. App. 2004) (gold necklace and gold teeth). See also *Brown v. Grounds*, Case No. 12-cv-01714-WHO (PR), 2014 U. S. Dist. LEXIS 114795 at *26 (V) (N.D. Cal. 2014) (rejecting habeas claim after state appellate court found that membership in NAACP "'not inherently connected to the race of the prospective juror'"); *Richards v. Relentless, Inc.*, 341 F3d 35, 45 (II) (C) (1st Cir. 2003) (rejecting argument that city of residence was proxy for striking juror based upon race and holding "[t]his statistical fact alone cannot convert a facially race-neutral explanation into one based upon race"). In light of these authorities, I would conclude that a juror's gold teeth are not a characteristic peculiar to any race for purposes of step two of the *Batson* analysis.[5]

---

[5] The reasoning of the South Carolina Supreme Court's decision in *Payton v. Kearse*, 495 SE2d 205 (S.C. 1998), does not conflict with this conclusion. In *Payton*, the court concluded that "[t]he term 'redneck' is a racially derogatory term applied exclusively to members of the white race[,]" relying upon a dictionary definition of the word that indicated it was "often a somewhat derogatory term." Id. at 208 (I). Thus, the term "redneck" was *not* facially race neutral. In this case, however, the prosecutor did not use a derogatory term or state anything linking gold teeth to

9

With regard to the "stereotypical belief" portion of the step two analysis, courts should examine whether the proffered explanation is based upon a stated stereotypical *belief* about a certain race or gender. "Belief" is defined as "something that is accepted, considered to be true, or held as an opinion." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/belief (website last viewed March 28, 2017). In this case, the State's explanation for the strike cited a race-neutral observable fact and did not express a belief or assumption about members of the juror's race or even a subgroup of that race. See generally *State v. Weaver*, 912 SW2d 499, 509 (Mo. 1995) (no *Batson* violation where prosecutor's decision to strike was not based upon assumptions about members of the juror's minority group). Compare See *State v. Jensen*, 76 P3d 188, 193 (II) (Utah App. 2003) (explanation for strike not gender-neutral where prosecutor assumed that men involved in a protective order "would be on the defendant's side, since more likely than not men are the respondents to protective orders, rather than women") (Citation and punctuation omitted.); *State v. Lucas*, 18 P3d 160, 162-163 (Ariz. App. 2001) (holding explanation that southern men take a negative view of pregnant women who work "wrongfully excludes a subgroup of one gender from participation in the judicial

members of only a certain race in his explanation for the strike of the juror.

10

process and reinforces prejudicial views of the relative abilities of men and women")

(punctuation omitted). I therefore disagree with the majority's conclusion that the

explanation in this case was not facially race-neutral because "having a mouth full of

gold teeth is a cultural proxy stereotypically associated with African-Americans." The

flaw in the majority's logic is that it equates a facially race-neutral explanation that

has a disparate impact upon one race with a stereotypical *belief*.[6] As outlined above,

this is not the proper standard for step two of the *Batson* analysis.

This disparate impact, however, is relevant to step three of the *Batson* analysis.

As we have already explained in *Knuckles*, supra, if a facially race or gender-neutral

explanation has a disparate impact upon a race or gender "it could constitute an

impermissible explanation." 236 Ga. App. at 453 (1). Convincing the court that the

explanation is actually a proxy for race or gender "would be part of the movant's

ultimate burden of persuasion" in step three of the *Batson* analysis. Id. In step three,

the trial court must

---

[6] As the majority acknowledges, the employment discrimination cases cited by it in footnote 15 are inapposite to the issue before us because they do not address the *facially* race-neutral second step of *Batson*. While facts excerpted from these opinions by the majority may demonstrate that gold teeth can be associated with African Americans, that fact is relevant to step three of the *Batson* analysis, not step two.

decide whether the opponent of the strike has proven the proponent's discriminatory intent in light of all of the circumstances that bear upon the issue of racial animosity. This involves an evaluation of the credibility of the strike's proponent, which in turn may depend on the specificity and case-relatedness of the explanation for the strike given at step two. The trial court may conclude that a vague explanation, or one that is in no way case-related, signals an unwillingness by the proponent to provide the real reason for the strike. And the proffer of a pretextual explanation naturally gives rise to an inference of discriminatory intent. Id. at 485. At the third stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.

(Citations and punctuation omitted.) *Toomer*, supra, 292 Ga. at 55 (2) (b).

In this case, the trial court found "that the Defendants did not prove discriminatory intent in the State's striking of [the juror]. The State provided clear race neutral explanations for the strike." And in the hearing following this Court's remand, the trial court acknowledged that it understood that the defense was arguing that the State's explanation for the strike was pretextual. "A trial court's findings on whether the opponent of the strike has met his burden of persuasion is entitled to great deference and will be affirmed unless clearly erroneous." *Barnes*, supra, 269 Ga. at 349 (6).

A trial court's determination of a *Batson* challenge rests largely on assessing the attorney's credibility and state of mind and therefore lies peculiarly within the province of the trial judge. Accordingly, where, as here, [race]-neutral reasons are given, the ultimate inquiry for the trial court is not whether counsel's reasons are suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not [race]-based.

(Punctuation and emphasis omitted.) *Henderson v. State*, 320 Ga. App. 553, 560 (5) (740 SE2d 280) (2013). In my view, the evidence before the trial court authorized it to conclude that the defendant failed to prove the prosecutor's discriminatory intent.[7]

While I reach this conclusion based upon existing United States Supreme Court and Georgia Supreme Court precedent,[8] like Judge Ray, I am "uneasy with the decision of the State to strike the prospective juror based, in part, on the fact that he

---

[7] Even the majority acknowledges "that nothing in the record demonstrates any actual racial animosity on the part of the prosecutor in justifying his strike."

[8] I acknowledge that valid and reasonable criticisms of the efficacy of the *Batson* analysis abound. See, e. g., Page, supra, ("the *Batson* peremptory challenge framework is woefully ill-suited to address the problem of race and gender discrimination in jury selection"). But despite these shortcomings, the *Batson* framework remains the law of the land, and this Court must faithfully follow the guidance of the United States Supreme Court and the Georgia Supreme Court with regard to its application and resist the urge to reformulate the standard despite the best of intentions. Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI ("The decisions of the Supreme Court shall bind all other courts as precedents.").

13

had gold teeth." And also like Judge Ray, I may have made a different finding in step three of the analysis with regard to discriminatory intent. But unlike the trial judge in this case, I did not witness the prosecutor's demeanor as he explained his basis for the strike. "As with the state of mind of a juror, evaluation of the prosecutor's state of mind based upon demeanor and credibility lies peculiarly within a trial judge's province." (Citation and punctuation omitted.) *Taylor v. State*, 279 Ga. 706, 708 (3) (620 SE2d 363) (2005). "To overturn the trial court's determination in this case would constitute de novo appellate review of a ruling made at stage three. . . ," contrary to the "precedents obliging this Court to accord great deference to the trial court's findings and to affirm them unless they are clearly erroneous." *Allen v. State*, 280 Ga. 678, 682 (2) (b) (631 SE2d 699) (2006). See also *Goldberg*, supra, 280 Ga. App. at 602 (de novo review of *Batson* step two; abuse of discretion review of steps one and three). Given this clear and long-standing precedent, I cannot find that the trial court's ruling was clearly erroneous. Consequently, I must vote to affirm the trial court.